**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FELECIA TAYLOR,** *et al.***,**

**Plaintiffs,**

**v.**

**DISTRICT OF COLUMBIA,** *et al.***,**

**Defendants.**

**Civil Action No. 08-0578 (BJR)**

**MEMORANDUM OPINION ON MOTION FOR PARTIAL SUMMARY JUDGMENT**

This matter is before the Court on a motion for partial summary judgment by Defendants, the District of Columbia (hereinafter the "District") and current and former District employees Olivia Golden, Lloyd J. Jordon, Elanor Sanders, Erica Sweeney, Judith Abunaw, Ivan C.A. Walks, and Nell Roberts (collectively the "District Employees").   *See* Mot. at Dkt. #207. Plaintiffs—Felecia Taylor, individually, and as legal guardian for minor Plaintiffs D.B. and T.B. (collectively "Plaintiffs")[1]—oppose the motion.   *See* Opp. at Dkt. #210.[2]   Having reviewed the briefing by the parties together with all other relevant materials, the Court now finds and rules as follows:

## I.   BACKGROUND

In May 2000, after becoming concerned for D.B.'s and T.B.'s health and welfare, the District removed the children from the custody of their birth mother and placed them in the foster care of Defendant Annie Malloy.[3]   Third Am. Compl. (Dkt. #159) ¶ 20.   They were 11 and 27

---

[1]   Plaintiffs D.B. and T.B. shall also be referenced collectively as the "minor Plaintiffs."

[2]   Plaintiff's original opposing brief (Dkt. #208) was so woefully insufficient that the Court determined that it was in the interest of justice to allow the filing of a revised opposition.   *See* Apr. 11, 2013 Minute Order.

[3]   The parties refer to Defendant Malloy interchangeably as "Malloy" and "Milloy."   As "Malloy"

months old at the time.   *Id*. ¶ 29.   Plaintiffs allege that, while D.B. and T.B. were in Malloy's custody, they were physically and sexually abused, exposed to "substantial adult sex acts" and alcoholism, and otherwise mistreated and neglected.   *Id*. ¶ 50.   Plaintiffs assert that at the time D.B. and T.B. were placed in Malloy's custody, Defendants were aware of the risk that the children would be abused, but chose to disregard that risk.   *Id*. ¶ 21.   Plaintiffs claim that the District had received prior reports that other foster children in Malloy's care and been subject to similar abuse.   *Id*.

Plaintiffs further allege that, during the three-year period that D.B. and T.B. lived with Defendant Malloy, Malloy was only licensed to foster children between the ages of 7 and 12 years old.   *Id*. ¶ 29.   During that same period, both minor Plaintiffs were under the age of 7 years old.   *Id*.   Therefore, Plaintiffs claim, the placement of the minor Plaintiffs in the care of Defendant Malloy was in violation of Malloy's foster care licensing capacity.   *Id*. ¶ 30. Furthermore, Plaintiffs allege that the minor Plaintiffs were placed in Defendant Malloy's home without the necessary completion of all home assessments, adult background checks, and lead-based paint clearance inspections, and without having obtained a lead-based paint clearance inspection certificate for the residence prior to the minor Plaintiffs moving into the home.   *Id*. ¶ 31.

According to Plaintiffs, approximately five months after D.B. and T.B. were placed with Malloy, the District initiated a "lead inspection" of Malloy's house, which revealed the presence of lead-based paint.   *Id*. ¶ 33.   On November 15, 2000, the Department of Housing ("DOH") issued a written "Notice of Defect" that stated that the lead hazard should be remediated within 10 days.   *Id*. ¶ 34.   Plaintiffs allege that the remediation never took place.   *Id*. ¶¶ 36-37.

---

appears to be the more frequent spelling, however, the Court will refer to her as such.

Plaintiffs claim that the DOH issued a second "Notice of Defect" on October 17, 2002, and

Defendants Thomas D. Walsh, Inc. (the property management company responsible for

Defendant Malloy's home), Lucille Hicks (one of the owners of Defendant Malloy's home), and

Malloy were again directed to remediate the hazard within 10 days.[4]   *Id.* ¶¶ 10-12, 39.

According to Plaintiffs, no action was taken to correct the hazardous situation or to remove the

minor Plaintiffs from the hazardous environment.   *Id.* ¶ 43.

Plaintiffs claim that D.B.'s and T.B.'s blood lead levels escalated to dangerous levels

while they resided in Malloy's house.   They assert that Defendants were aware of D.B.'s and

T.B.'s escalating blood lead levels:   "[t]he records indicate that [the children's] lead levels were

being followed on a regular basis . . . by the [Department of Health] lead team."   *Id.* ¶ 41.

According to Plaintiffs, despite being aware of the unacceptable living conditions at the

Malloy residence, Defendants allowed D.B. and T.B. to remain in Malloy's custody for nearly

three years.   *Id.* ¶¶ 47-52.   Plaintiffs allege that on March 1, 2003, after being "exposed [] to

adult sex acts and/or other improper behavior and conduct by [Malloy]," the boys were finally

removed from Malloy's custody and placed in the foster care custody of Plaintiff Taylor, with

whom they continue to reside.   *Id.* ¶¶ 52-53.

Plaintiffs allege that Malloy was relicensed at least twice during the time the minor

Plaintiffs resided with her, in August 2000 and September 2001.   Opp. at 2.   Plaintiffs claim

that in May 2000, when D.B. and T.B. were initially placed in the care of Defendant Malloy, the

Department of Consumer and Regulatory Affairs (DCRA) was responsible for licensing foster

care homes, while the Department of Health (DOH) was responsible for issuing licenses to

District of Columbia foster parents.   Compl. ¶¶ 22, 24.   Plaintiffs claim that, after July 1, 2001,

---

[4]   Defendants Hicks and Walsh, Inc. were dismissed from the case in 2009 and 2010, respectively.   *See infra.*

the District Child and Family Services Agency (CFSA) assumed responsibility for licensing foster care homes in the District of Columbia, including issuing renewal licenses for Defendant Malloy and her residence.   *Id.* ¶ 26; Opp. at 2.   Plaintiffs claim that Defendant Golden was the Director and decision-maker for CFSA during the relevant period.   Compl. ¶ 7.   Furthermore, Plaintiffs claim that Defendant Jordan was the Director and decision-maker for DCRA during the relevant period, while Defendant Walks was the Director and decision-maker for DOH, and responsible for licensing Defendant Malloy as a foster parent.   *Id.* ¶¶ 8, 15.

Plaintiffs claim that, during the three-year period, Defendants Sanders, Sweeney, and Abunaw were social workers at CFSA who were responsible for ensuring the safety of the minor Plaintiffs' care.   *Id.* ¶¶ 9, 13, 14.   Plaintiffs also claim that Defendant Roberts was a home assessor for CFSA during the relevant period, and responsible for monitoring the suitability of the minor Plaintiffs' foster placement.   *Id.* ¶ 16.

Plaintiffs allege that, as a result of the Defendants' failure to protect D.B. and T.B. while they were in the District's custody, each child has suffered irreparable harm, including severe cognitive and behavioral defects.   *Id.* ¶ 87.   D.B. has severe mood and behavioral disorders, including anxiety, anger, ADHD, and learning disorders.   He has been hospitalized on four separate occasions for suicidal and homicidal ideations, depression, and post-traumatic stress disorder.   *Id.* ¶ 88.   T.B. requires psychotropic medication, psychological counseling, behavioral modification therapy, occupational therapy, speech-language therapy, and specialized education services.   *Id.* ¶ 89.   Plaintiff Taylor claims that she has suffered emotional distress, medical expenses and lost wages as a result of the District's actions.   *Id.* ¶ 102.

Initially, Plaintiffs brought claims for civil rights violations against the District and the District Employees under 42 U.S.C. § 1983 (Counts IV and V), claims for common law

negligence and gross negligence against the District Employees, Malloy, Hicks, and Walsh, Inc.,
along with a claim for punitive damages (Counts I, II, and VI), and a claim for breach of implied
warranty of habitability against Hicks and Walsh, Inc., the individual and entity who owned the
Malloy home (Count III).   *Id.* ¶¶ 91-169.

This case was originally assigned to Judge Henry Kennedy.   Defendant Malloy never
appeared, and a default judgment was entered against her on October 2, 2008.   *See* Dkt. # 33.
In addition, Defendant Hicks was dismissed from the case on June 17, 2009, on jurisdictional
grounds.   *See* Dkt. #103.   Defendant Walsh, Inc. was dismissed from the case on February 24,
2010.   *See* Dkt. #143.   As Count III (Breach of Implied Warranty of Habitability) was alleged
only against Defendants Hicks, Walsh, Inc., and Malloy, and none of these Defendants remains
in the case, it is no longer a viable claim in this suit.

In a hearing held on March 11, 2010, Judge Kennedy granted in part and denied in part a
Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, for Summary
Judgment, filed by the District Employees (with the exception of Roberts, who was not yet
named in the lawsuit).   *See* Mar. 11, 2010 Order (Dkt. #147) at 1.   Judge Kennedy granted the
motion as it related to Plaintiffs' federal claims against the District Employees, but denied it to
the extent it requested that the court decline to exercise supplemental jurisdiction over the
remaining common law claims against the District Employees.   *Id.*

Following Judge Kennedy's decision, on May 3, 2010, Magistrate Judge Kay issued an
opinion on Plaintiffs' Motion for Leave to Amend Complaint, which sought the addition of
Defendants Nell Roberts and five Doe Defendants to Plaintiffs' complaint.   *See* May 3, 2010
Memorandum Order (Dkt. #158).   Judge Kay denied leave to add Roberts to the federal claims
in the Third Amended Complaint as futile, but granted leave to add her to Plaintiffs' common

law claims.   *Id*. at 9.   Judge Kay denied leave to add the Doe Defendants to any of Plaintiffs'
claims.   *Id.*

On May 28, 2010, Defendants filed a Motion to Dismiss the Third Amended Complaint.
The case was re-assigned to the undersigned judge on October 18, 2011.   Dkt. #184.   On
January 17, 2012, this Court granted the Motion to Dismiss as to the federal claims against
District Employees Golden, Jordon, Sanders, Sweeney, Abunaw, Walks, and Roberts.   *See* Jan.
17, 2012 Order (Dkt. #189) at 13.   This Court denied the Motion to Dimiss as to the federal
claims against the District and further denied the Motion as to the common law claims against
the District Employees.   *Id*. at 13-14.   The District and the District Employees answered the
Third Amended Complaint on January 31, 2012.   Answer (Dkt. #190).[5]

The District and District Employees now move for partial summary judgment.   Mot. at
1.   They request that the Court dismiss the constitutional claims against the District (Counts IV
and V) and dismiss the common law and punitive damages claims against the District Employees
(Counts I, II, and VI).   *Id*.   According to the District, if this Court grants the summary
judgment motion, the only remaining claims would be Counts I and II (Negligence and Gross
Negligence) against the District.[6]   *See* Mot. at 1.

---

[5]   Defendants also filed a "Cross-Claim" against Thomas D. Walsh, Inc., Annie Malloy, Lucille Hicks, and Does 3-5.   Defendants made an oral motion to dismiss their cross-claim in a hearing before this Court on April 11, 2013, which was heard and granted.   *See* Apr. 11, 2013 Minute Entry.

[6]   Defendants style their motion as one for "partial summary judgment," and state that, if the motion is granted, the only remaining claims would be Counts I and II (Negligence and Gross Negligence) against the District.   *See* Mot. at 1.   As the Court indicated in the motion hearing on April 11, 2013, Counts I and II are not actually alleged against the District of Columbia in Plaintiffs' Third Amended Complaint.   Third. Am. Compl. at 24 and 26 (limiting the claims to the District Employees and Does 1-5).   Nonetheless, the District's reply brief, filed on May 7, 2013, indicates that "[o]nly Plaintiffs' negligence and gross negligence claims against the District should proceed to trial."   Reply at 1.

A Court may hold that a party has consented to the amendment of a pleading from the actions of that party, especially if the actions are evidenced by a writing.   *See* 6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1490 (4th ed. 2010).   Therefore, the

## II.    LEGAL STANDARD

This Court shall grant summary judgment if the Defendants show that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law.    Fed. R. Civ. P. 56(a).    In reviewing the instant motion for summary judgment, this Court must "draw all reasonable inferences in favor of the [Plaintiffs], and . . . may not make credibility determinations or weigh the evidence."    *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (citations omitted).    In deciding whether summary judgment is appropriate, therefore, the Court must resolve doubts in favor of the Plaintiffs.    *Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 255 (1986) (citation omitted).    However, Plaintiffs cannot successfully rest their opposition on bare allegations.    *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (noting that a non-moving party may not rely solely on allegations or conclusory statements). Instead, Plaintiffs' opposition must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.    *Pickett v. Potter*, 571 F. Supp. 2d 66, 69 (D.D.C. 2008) (Freidman, J.) (citing Fed. R. Civ. P. 56(e)).

## III.    DISCUSSION

### A.  Facts Presented by Plaintiffs

Plaintiffs set forth the following facts, supported by evidence, which are accepted as true for purposes of this motion:

1. From the minor Plaintiffs' placement at Defendant Malloy's home on June 27, 2000 until their removal from the home on March 1, 2003, the District was responsible for their care and welfare, as well as ensuring that the minor Plaintiffs were provided with a reasonably safe environment in which to reside.    Opp. at 1; Pls.' Ex. 1 (District Ans. To Pls.' Req. for Adm.) ¶¶ 35-36.

---

Court holds that Counts I and II have been pleaded against the District.

2.  On June 27, 2000, Defendant Jordon was Director of the DCRA, which was the agency that had decision-making authority to license Defendant Malloy as a foster parent and to approve or license her property as a District of Columbia foster home at that time.    Opp. at 2; Pls.' Ex. 1 ¶ 6; Pls.' Ex. 2 (District Ans. to Minor Pls.' First set of Interrogatories) ¶¶ 12-13.    After July 1, 2001, the CFSA, headed by Defendant Golden, assumed responsibility for the licensing of foster parents and homes in the District of Columbia. *Id.*[7]

3.  The District issued licenses to Malloy to operate her home as a foster facility on August 31, 2000, and September 19, 2001.    Pls.' Exs. 3-A (2001 License for Youth Residential Facility) and 3-B (2000 License for Youth Residential Facility).    The licenses were identified as originating with the District of Columbia Department of Health, and were signed by Defendant Walks in his capacity as Director of the Department of Health.    *Id.* The CFSA was identified on the licenses as the "Certifying Child-Placing Agency."    *Id.*

4.  Defendants never obtained a lead-based paint inspection certificate, which the District acknowledges was required for all homes where a child under the age of six would be placed.    Pls.' Ex. 4 (District Supp. Ans. to Pl. Taylor's First Set of Interrogatories) ¶¶ 13-14; Pls.' Ex. 3 (District Ans. to Pl. Taylor's First Set of Interrogatories) ¶ 9; Pls.' Ex. 3-C (Municipal Regulation requiring that a lead-based paint certificate indicating that there is no risk from lead-based paint in home in which a foster child under the age of six may be placed).[8]

5.  On June 2, 2000, the CFSA requested that the Department of Health inspect and test Defendant Malloy's home for lead-based paint, as CFSA was "evaluating it for a license to provide foster care for children."    Pls.' Ex. 3-D (Lead Poisoning Prevention Program Request Form).    The Department of Health's lead-based paint inspection was conducted on September 6, 2000.    Pls.' Ex. 5-A (Nov. 2000 Department of Health Notice of Defect ) at 5.    On November 15, 2000, the Department of Health issued a "Notice of

---

[7]    While Plaintiffs do not set forth evidence as to when Defendant Golden was Director of CFSA, Defendants state that Defendant Golden was the Director of the CFSA from June 2001 until April 2004.    Defs.' Stmt. of Undisputed Material Facts ¶ 8.

[8]    As of July 27, 2001, the District of Columbia Municipal Regulations required that a home study prior to the licensing of a prospective foster home would include, "[f]or homes in which a foster child under six (6) years of age may be placed, obtaining a lead-based paint certificate indicating no risk from lead-based paint."    D.C. Mun. Regs. tit. 29, § 6027.3(k) (2001).    The current form of the rule appears at D.C. Mun. Regs. tit. 29, § 6028.3(k) (2012).    The Court has been unable to identify any Municipal Regulation prior to 2001 setting forth the requirements for foster home licensing, including any requirement for certification of lead-based paint hazards.    However, as the District appears to acknowledge the requirement as existing in 2000 in its discovery responses, and does not raise the issue as a legal matter in its motion, the Court will assume, at this stage, that such a requirement existed.

Defect" identifying the existence of a lead-based paint hazard at Defendant Malloy's home.   *Id.* at 1.

6. On September 10, 2002, the Department of Health conducted another lead-based paint inspection of Defendant Malloy's home "due to the fact that the minors, D.B. and T.B., were under the jurisdiction of CFSA."   Pls.' Ex. 3 ¶ 9.   On October 17, 2002, the Department of Health issued a second "Notice of Defect" identifying the existence of a lead-based paint hazard at Defendant Malloy's home.   Pls.' Ex. 5-B (Oct. 2002 Department of Health Notice of Defect).

7. Defendants took no action to ensure the abatement of the lead-based paint hazard, and took no action to remove the minor Plaintiffs from Defendant Malloy's home prior to March 1, 2003.   Pls.' Ex. 1 ¶ 28.

8. On April 3, 2004, the CFSA produced a report entitled "History of Lead Exposure for D. and T. B."   Pls.' Ex. 3-E (hereinafter the "Report").   The Report indicates that, between June 2000 and March 2003, the period during which the minor Plaintiffs resided at Defendant Malloy's home, D.B.'s blood lead levels were tested at least ten times, while T.B.'s blood lead levels were tested at least nine times.   *Id.* at 4, 7.   According to the Report, the minor Plaintiffs had been exposed to lead prior to their placement with Defendant Malloy; however, it was in Defendant Malloy's home that "the children's lead levels soared."   *Id.* at 2.   During the placement with Defendant Malloy, D.B. and T.B. sustained blood lead levels over 2-4 times the upper limits of normal, with the highest levels for both children in August 2002.   *Id.*   The lead levels were followed on a regular basis at both the Upper Cardoza Health Center and by the DOH lead team.   *Id.*

9. The Report further states that a review of the outpatient clinic records from Upper Cardoza Health Center indicated that, on one occasion for each child, it was noted that the children had lead levels above the normal limits, and that a physician had been in contact with the foster mother and was aware that the DOH lead team had been to inspect the home.   *Id.*

10. During the period that the minor Plaintiffs were in Defendant Malloy's home, while testing indicated that they had sustained high blood lead levels, the District took no action in response.   Ex. 3 ¶ 23.

11. As a home assessor for the CFSA, Defendant Roberts was aware that Defendant Malloy was licensed to have up to two foster children in her care, between the ages of seven and twelve.   Pls.' Att. A (Dep. of N. Roberts, Apr. 22, 2009) 122:3-123:17.   Defendant Roberts was aware on her home visit that Defendant Malloy, who had three children under the age of six in her home, was not compliant with her licensing capacity as a foster caregiver.   *Id.* 123:22-125:9.   Defendant Roberts testified that there was no

procedure to be followed in response to Defendant Malloy's non-compliance, and that if someone was out of compliance, it was "okay."   *Id.* 125:7-15.

12. As CFSA social worker for D.B. and T.B. for fifteen months in 2002-2003 (Mot. at 6), Defendant Sanders was not made aware of any CFSA policy regarding the placement of children in foster homes in which there existed a lead-based paint hazard, nor was she made aware of any policy regarding the retention of foster children in such homes.   Pls.' Ex. 6 (Def. Sanders' Resp. to Pls.' Req. for Adm.) ¶¶ 3-4. [9]

## B.  The Section 1983 Claim Against the District

In Count IV of the Third Amended Complaint, Plaintiffs allege that the District deprived D.B. and T.B. of their rights under the Fifth Amendment of the Constitution, alleging under 42 U.S.C. § 1983 that the District was under a Constitutional obligation to take all reasonable measures to guarantee the minor Plaintiffs' safety and to protect them from harm, but that the District acted with deliberate indifference to the Plaintiffs' Constitutional rights.   Third Am. Compl. ¶¶ 148-49.   In Count V of the Third Amended Complaint, Plaintiffs allege that the District has a "pattern" of:   (1) "overload[ing]" its social workers, home monitors, licensing agents and placement specialist with "excessive case load[s]," (2) "provid[ing] [] inadequate case information and/or resources," and (3) "deficient[ly] select[ing], training, supervis[ing], and retaining" its employees.   *See* Third Am. Compl. at ¶¶ 155-157.   Plaintiffs claim that this "pattern," in conjunction with the District's "failure to improve, remedy, supplement or otherwise upgrade the training and supervision of its [employees]" constituted a "deliberate indifference" to the risk that children in its care would be harmed.   *Id.* at ¶ 159.

In order to prevail on a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must demonstrate both that she suffered a constitutional violation, and that the city is responsible

---

[9]   Plaintiffs do not appear to have attached Exhibit 6 to their revised opposition.   However, Exhibit 6 was properly attached to Plaintiffs' original opposition, and the Court refers to that document.   *See* Dkt. #208-5.

for that violation.   *See Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008)

(citing *Baker*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)).   *See* Mot. at 9.   In this Circuit, "[a] child

in foster care is in custody for substantive Due Process purposes and a State (or the District)

owes the child a constitutional duty of care."   *Cohen v. District of Columbia*, 744 F. Supp. 2d

236, 242 (D.D.C. 2010) (citing *Smith v. District of Columbia*, 413 F.3d 86, 95 (D.C. Cir. 2005)).

*See also Smith*, 413 F.3d at 95 ("[W]here the government assumes full responsibility for a child

by stripping control from the family and placing the child in a government-controlled setting, the

government assumes a duty for the child's welfare.").

While a municipality is a "person" subject to suit under 42 U.S.C. § 1983, its liability is

limited to actions pursuant to official municipal policy.   *See Monell v. Dep't of Soc. Servs. of

New York*, 436 U.S. 658, 690-91 (1978).   A court must determine that the plaintiff has

established an "affirmative link . . . such that a municipal policy was the 'moving force' behind

the constitutional violation."   *Baker*, 326 F.3d at 1306 (citations omitted).   In any case,

however, "proof of a single incident of unconstitutional activity is not sufficient to impose

liability under *Monell*" unless there is proof that the activity was caused by municipal policy.

*Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

A "policy" may be set by a municipality in a number of ways, including explicit adoption

of an unconstitutional policy by a policy maker, "the adoption . . . by a policy maker of actions

by his subordinates that are so consistent that they have become 'custom,'" or "the failure of the

government to respond to a need (for example, training of employees) in such a manner as to

show 'deliberate indifference' to the risk that not addressing the need will result in constitutional

violations."   *Baker*, 326 F.3d at 1306.   "Deliberate indifference is determined by analyzing

whether the municipality knew or should have known of the risk of constitutional violations."

*Id.* at 1307.   "Deliberate indifference is determined by analyzing whether the municipality knew

or should have known of the risk of constitutional violations, an objective standard."   *Id.*

"Deliberate indifference" requires more than "mere negligence."   *Warren v. District of*

*Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).

The District's motion does not question whether Plaintiffs have alleged that they suffered

a Constitutional violation.   The District argues that Counts IV and V should be dismissed

because Plaintiffs have failed to develop the record to show that an official policy or custom of

the District caused Plaintiffs' injuries.   Mot. at 9.   The District argues that "no reasonable jury

could find that [it] was the 'driving force' behind the alleged violation of [D.B.'s and T.B.'s]

rights under the constitution."   Mot. at 9.   According to the District, there is no evidence that

any "District policy maker was deliberately indifferent to the presence of lead paint in the

Malloy home."   *Id*. at 10.   To the contrary, the District asserts, the "individuals named by

plaintiffs, did not know about the lead-based paint in the Malloy home, and Plaintiffs have failed

to produce any record evidence to the contrary."   *Id.*[10]   The District further asserts that even if

Plaintiffs were able to properly support their allegations with evidence in the record, its

purported inaction in connection with the minor Plaintiffs amounts to a "single incident of

unconstitutional activity," and not a municipal policy or custom.   *See* Reply (Dkt. # 211) at 2.

In light of the facts and evidence presented by Plaintiffs (Section III.A, *supra*), the Court

determines that there exist genuine disputes of material fact as to Plaintiffs' claims against the

---

[10]   The Court notes that the District construes the Plaintiffs' claims too narrowly.   The claims are only
based in part on the presence of a lead hazard in Defendant Milloy's home, and the District's alleged
failure to remove the minor Plaintiffs expediently in light of that lead hazard.   *See, e.g.,* Third Am.
Compl. ¶161 (alleging deliberate indifference through the failure to follow official policies
concerning "adher[ing] to reasonable and proper foster home placement requirements . . .
comply[ing] with foster parent licensing capacity limits [and] . . . properly and/or timely remov[ing]
foster children from foster home with known unremedied dangers, including, but not limited to, lead
based paint hazards").

District, and summary judgment is not appropriate.    First, contrary to the District's position, the evidence demonstrating a failure to remove the children from a known lead hazard over a three-year period does not clearly comprise a "single incident."    Furthermore, there exist key questions as to what District policy makers—including Defendants Jordon, Golden, and Walks—knew and when they knew it.    Resolving doubts in favor of the Plaintiffs, as the Court must at this stage, Plaintiffs' facts present a culture where communication failures—between agency subordinates and supervisors, and between the agencies themselves—and failures to take corrective action were so pervasive that a reasonable jury could infer that District policy makers had actual or constructive knowledge of the actions of their subordinates.    Indeed, those failings so permeated the agencies' actions that a reasonable jury could further infer that the District's failure to follow its own policies amounted to a municipal custom or practice, and that the policy makers displayed deliberate indifference in failing to take corrective action.    In the alternative, as Plaintiffs suggest, a reasonable jury could infer that the District established a custom or practice of insulating policy makers in an effort to protect itself from Constitutional liability.

Plaintiffs have presented sufficient evidence to create genuine disputes of material fact as to the knowledge of the District policy makers, and as to whether there existed customs or practices or overall "deliberate indifference" to render the District liable under 42 U.S.C. § 1983 for the Plaintiffs' injuries.    Therefore, the question of that liability should be put to a jury.

### C.  The Negligence Claims

In Counts I (negligence) and II (gross negligence) of the Third Amended Complaint, Plaintiffs allege that the Defendants had a duty to maintain a safe and hazard-free environment for the minor plaintiffs, along with a duty to remove them from hazardous conditions or to remedy the hazardous conditions in a timely manner.    Third Am. Compl. ¶¶ 92-94.    Plaintiffs allege that the Defendants violated and breached their duty by failing to take reasonable or

necessary actions to ensure the health, safety, and well-being of the minor plaintiffs, more particularly by failing to properly monitor or evaluate their foster care placement with Malloy, and by failing to provide the minor plaintiffs with timely treatment for lead exposure. *Id.* ¶¶ 97-98. Plaintiffs allege that their injuries (including the health consequences experienced by the minor Plaintiffs following lead exposure) were directly and proximately cause by the acts and failures to act by the District employees. *Id.* ¶¶ 101-02.

The District Employees move for summary judgment on the claims for negligence and gross negligence the District Employees. Mot. at 11.[11] They argue that Plaintiffs "cannot show any connection between any act or omission of the [District Employees] and the alleged injuries to plaintiffs. . . . [P]laintiffs cannot show a deviation from the relevant standard of care by any of the individual defendants that has a causal connection with their alleged injuries." *Id.*

### 1.    *Count I:    Negligence*

In a negligence action, a plaintiff "bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Convit v. Wilson*, 980 A.2d 1104, 1123 (D.C. 2009) (citations omitted).[12]

With respect to the first requirement, a plaintiff is required to put on expert testimony to establish the relevant standard of care "if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Hill v. Mtro. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001) (citing *District of*

---

[11]   As noted *supra*, the District does not move for summary judgment on Counts I and II.

[12]   As a threshold issue, one can be held liable for negligence only if there was a duty owed to the injured party. *See N.O.L. v. District of Columbia*, 674 A.2d 498, 499 n.2 (D.C. 1995). As the District Employees do not question that a duty was owed to the Plaintiffs, the Court will consider the point conceded.

*Columbia v. Arnold & Porter*, 756 A2d 427, 433 (D.C. 2000)).   Conversely, if the subject

matter is "within the realm of common knowledge and everyday experience," then no expert

testimony is needed.   *Id.* (citations omitted).   The determination of the applicable standard of

care is a question of fact to be determined by the jury.   *Burke v. Scaggs*, 867 A.2d 213, 219

(D.C. 2005).   The question of whether there was a deviation from that standard is also a

question for the jury.   *Levy v. Schnabel Found. Co.*, 584 A.2d 1251, 1255 (D.C. 1991).

      In establishing that a deviation from the standard of care proximately caused a plaintiff's

injuries, "the plaintiff must present evidence from which a reasonable juror could find that there

was a direct and substantial causal relationship between the defendant's breach of the standard of

care and the plaintiff's injuries and that the injuries were foreseeable."   *Convit*, 980 A.2d at

1125 (citation omitted).   Proximate cause is ordinarily a question of fact for the jury.   *Id.* at

1126.   In fact, only where a reasonable juror "could draw but one conclusion from the facts

alleged" will " negligence and proximate cause become questions of law."   *Id.*

      Defendants allege the following:

1.  Defendant Jordan served as the director of DCRA from 1998 to 2000.   Mot.
    at 11.   During his tenure at DCRA, he had no involvement in the licensing or
    monitoring of foster homes, nor did he have any authority to develop or
    implement such policies.   *Id.*   He also had no involvement in placing D.B.
    and T.B. in foster care or monitoring the placement.   *Id.*;

2.  Defendant Golden was the director of CFSA from June 2001 to April 2004.
    *Id.* at 12.   While CFSA director, she had no direct involvement with the
    licensing or monitoring of foster homes in the District.   *Id.*   She also had no
    personal knowledge of the facts or circumstances surrounding the allegation in
    Plaintiffs' Third Amended Complaint.   *Id.*;

3.  Defendant Walks was the former director of DOH and resigned from the
    position in May 2002.   *Id.* at 12-13.   During his tenure at DOH, the agency
    had no authority to license foster homes.   *Id.* at 13.   In addition, the DOH
    did not issue the alleged 2002 Notice of Defect until after he resigned as

director of DOH.[13]   *Id*.   He had no knowledge of the circumstances alleged in Plaintiffs' complaint.   *Id*.;

4.   Defendant Abunaw is a CFSA social worker.   *Id*.   She was in contact with D.B and T.B. for approximately seven months in 2000-2001.   *Id*.   During this time, she had no involvement with the decision to license Milloy's home, and no personal knowledge of the facts and circumstances underlying Plaintiffs' claims when the events purportedly transpired.   *Id*.;

5.   Defendant Sanders was a supervisory CFSA social worker.   *Id*. at 14.   Her only contact with D.B. and T.B. was from 2002 to 2003.   *Id*.   During this time, she had no involvement with the decision to license the Milloy home. *Id*.   She had no personal knowledge of the alleged misconduct at issue until after she was served with the second amended complaint in this case.   *Id*.;

6.   Defendant Sweeney is a CFSA social worker.   *Id*.   Her only contact with D.B and T.B. was in 2001 for approximately two months. During this time, she had no involvement in the decision to license the Milloy home.   *Id*.   She knew nothing of the alleged lead-based hazard or misconduct by Milloy until she was served with the complaint.   *Id*.; and

7.   Defendant Roberts has worked at CFSA for more than forty years.   *Id*. at 15. She had no role or involvement in the decision to license Milloy as a foster parent, nor any involvement in the screening or assessing of either Milloy or her residence for foster placement.   *Id*.   As part of her duties as a Resource Development Specialist, Defendant Roberts submitted a request in June 2002 for DOH to conduct a lead inspection of the foster care property where Milloy resided and the minor Plaintiffs were placed.   *Id*. at 16.   She submitted the request on a DOH form, to DOH, because DOH was the agency responsible for the inspection of District residences for lead-based paint.   *Id*.   She had no personal knowledge that the DOH issued the alleged Notice of Defect until she was served with the second amended complaint.   *Id*.

Mot. at 11-15.

Defendants contend that Plaintiffs fail to identify the relevant standard of care or to point to any conduct by any District Employee that does not meet that standard, and claim that Plaintiffs have failed to point to any evidence that would permit a reasonable juror to find in their favor.   Reply at 4.   The Court disagrees.

---

[13]   While Defendant Walks left his position prior to the issuance of the 2002 "Notice of Defect," Defendants do not address whether he had knowledge of the 2000 "Notice of Defect" issued by DOH.

As to Defendants Jordon, Golden, and Walks, Plaintiffs have presented evidence demonstrating that each of these Defendants was at some relevant point, during the sequence of events described by Plaintiffs, in a directorial position in an agency that had the authority to issue foster parent licenses (Defendant Jordon), foster facility licenses (Defendant Walks), or both (Defendant Golden).   *See* Section III.A, *supra* ¶¶ 2-3.   These respective roles are enough to raise a genuine dispute of material fact as to whether these Defendants, in their supervisory capacities, knew or should have known of the facts and circumstances surrounding Defendant Malloy's licensing and relicensing as a foster parent, her alleged misconduct, and the condition of her home.   Such a dispute of fact goes directly to the question of whether these Defendants deviated from the standard of care, and whether that deviation resulted in the alleged injuries to Plaintiffs.

As to Defendants Abunaw, Sweeney, Sanders, and Roberts, Defendants seem to claim that these Defendants cannot be liable because they were not involved in licensing decisions. However, Plaintiffs' claim of negligence is not limited to the circumstances of Defendant Malloy's licensing and re-licensing; Plaintiffs also claim that Defendants were negligent in not removing the minor Plaintiffs from Defendant Malloy's home, or verifying that the hazards in Defendant Malloy's home—including, but not limited to, the lead-based paint hazard—were eliminated.   It would seem "within the realm of common knowledge and everyday experience" that social workers would have, or should have, some knowledge of the living circumstances and medical conditions of the children in their charge.   *See* Section III.A, *supra*, ¶¶ 8-9.   Likewise, as a home assessor for the CFSA, Defendant Roberts visited Defendant Malloy's home and observed violations of Defendant Malloy's foster license.   *See* Section III.A., *supra* ¶ 11. Given the evidence presented by Plaintiffs, there is a genuine dispute of material fact as to

whether these Defendants knew or should have known if the minor Plaintiffs were in harm's way.    Again, such a dispute of fact goes directly to the question of whether these Defendants deviated from the standard of care, and whether that deviation resulted in the alleged injuries to Plaintiffs.

Therefore, the District Employees' motion for summary judgment as to Count I is denied.

### 2.    *Count II:    Gross Negligence.*

According to the District of Columbia Court of Appeals, "gross negligence" is defined as "the failure to exercise even slight care," and "such negligence as would shock fair-minded men."    *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997) (quoting *Shea v. Fridley*, 123 A.2d 358, 363 (D.C. 1956)).    Gross negligence "requires such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful, and reckless disregard or conscious indifference for the rights and safety of others."    *Id.* (defining the term "gross negligence" as it appears in D.C. Code § 2-412, concerning governmental immunity for negligent operation of vehicles by District employees).    While Plaintiffs have successfully raised a genuine dispute of material fact as to their negligence claim, they have failed to do so on their claim for gross negligence.    Plaintiffs have failed to put forth any evidence to support the contention that any of the District Employees deviated from the ordinary standard of care to such an extreme degree.    As such, the Court finds that the only conclusion a reasonable jury could reach is that the District Employees' actions were not "wanton, willful, and reckless," and summary judgment will be granted as to the District Employees on Count II.

### C.  Punitive Damages

In Count VI of the Third Amended Complaint, Plaintiffs allege that the District

Employees[14] "acted with actual malice towards Plaintiffs and/or with conduct which under the circumstances amounts to willful, wanton, and/or conscious disregard of the Plaintiffs' rights." Third Am. Compl. ¶ 166.   Plaintiffs further allege that the District Employees "knew the likely danger their actions and/or inactions presented to Plaintiffs," but "willfully disregarded Plaintiffs' safety and well being [*sic*] with full knowledge of the harmfulness of their actions," and took such actions knowing the "extremely high risk" that Plaintiffs would be injured in the precise manner alleged by Plaintiffs.   *Id.* ¶¶ 167-168.

"Punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury."   *Caulfield v. Stark*, 893 A.2d 970, 979-980 (D.C. 2006) (quoting *Washington Med. Ctr., Inc. v. Holle*, 573 A.2d 1269, 1284 (D.C. 1990)).   The evidence presented by Plaintiffs provides no support for their contention that the District Employees' actions were malicious, willful, wanton, or reckless. There is no evidence that any of the individual District Employees had sufficient knowledge of the precise harm with which Plaintiffs were threated, such that their actions or inactions amounted to a willful disregard of the Plaintiffs' safety.   Therefore, the Court grants summary judgment to the District Employees on Count VI of the Third Amended Complaint.

---

[14]   Count VI is not alleged against the District, and the District has not indicated that it believes that Count VI was alleged against it.

**THEREFORE**, it is, hereby, **ORDERED:**

1) Defendants' Motion for Partial Summary Judgment is **DENIED** as to Counts I, IV, and V of the Third Amended Complaint;

2) Defendants' Motion for Partial Summary Judgment is **GRANTED** as to the District Employees on Count II; and

3) Defendants' Motion for Partial Summary Judgment is **GRANTED** as to Count VI.

A separate Order consistent with this Memorandum Opinion shall be issued.

July 1, 2013

_____

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE